# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-10-00776-CR
NO. 03-10-00777-CR
NO. 03-10-00779-CR

**Randall Scott Jordan, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
NOS. D-1-DC-09-904095, D-1-DC-08-301818, D-1-DC-09-904094
HONORABLE BOB PERKINS, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

Randall Scott Jordan was convicted of aggravated assault, aggravated sexual assault, and aggravated kidnaping, and the jury imposed a sentence of life in prison for each offense with the sentences running concurrently. The victim in this case was Mary Brown.[1] During the trial, Jordan requested that the jury be given a lesser-included-offense instruction for simple assault and asked the district court to admit into evidence three recordings of conversations between Jordan and Brown. The district court denied both requests. On appeal, Jordan challenges both of those rulings. We will affirm the judgment of the district court.

---

[1] To protect the privacy rights of the victim, we will use a pseudonym to refer to her. *See* Tex. Code Crim. Proc. Ann. art. 57.02 (West Supp. 2011) (allowing victim in sexual assault case to request to be referred to by pseudonym rather than actual name).

## BACKGROUND

Jordan met Brown when they were children, and they reconnected as adults. At some point, Jordan was incarcerated, but Brown and Jordan stayed in contact. When Jordan was let out on parole, he spent the night at Brown's home, and the two of them were sexually intimate. However, the day after he was paroled, Jordan was arrested for violating the terms of his parole, and he was sent back to prison for approximately two months. While Jordan was in prison, he and Brown talked on the phone on several occasions, but Brown became romantically involved with another man named Frank Galvan.

When Jordan was released from prison, he contacted Brown, and she agreed to meet with him. Jordan and Brown drove separately to a hotel room in Austin, Texas. The events that occurred after they went to the hotel are disputed and form the basis for this appeal. What is not disputed is that Jordan hit Brown numerous times while they were in the hotel room, that Jordan drove Brown to San Antonio the next day in Brown's car, that Jordan paid for another hotel room in San Antonio, that Jordan left Brown in the hotel room and drove off, that Brown waited until Jordan was gone and then asked for help from the hotel's employees, that the employees called the police, and that Brown was taken to a hospital to get treatment for injuries that she sustained during her encounter with Jordan, including injuries to her face, neck, and vagina.

After Jordan was arrested, he was charged with aggravated kidnaping, multiple counts of aggravated assault with a deadly weapon, and multiple counts of aggravated sexual assault. During trial, Jordan pleaded not guilty to the alleged offenses, but the jury found him guilty of aggravated kidnaping, one count of aggravated assault with a deadly weapon, and two counts of

2

aggravated sexual assault. Regarding the aggravated assault charge, the jury found that Jordan strangled Brown with his hand and that the manner in which he used his hand constituted a deadly weapon. Regarding the aggravated sexual assault charges, the jury found that Jordan penetrated Brown's vagina with a bottle and with his penis without her consent. During the punishment hearing, Jordan pleaded true to enhancement paragraphs alleging that he had prior felony convictions for unauthorized use of a motor vehicle, forgery, robbery, and burglary of a habitation. After the punishment hearing, the jury sentenced Jordan to imprisonment for life for each offense with the sentences running concurrently.

Shortly after the jury assessed his punishment, Jordan filed this appeal challenging his conviction.

## DISCUSSION

In his appeal, Jordan raises two issues. In his first issue, he challenges the jury charge. Specifically, he contends that the district court erred by failing to give jury instructions for the lesser-included offense of assault. In his second issue, Jordan argues that the district court erred by refusing to admit into evidence recordings of conversations between Jordan and Brown that were made before the alleged crime. We will address those issues in the order briefed.

*Lesser-Included Offense*

As mentioned above, in his first issue Jordan asserts that the district court erred by failing to include in the jury charge an instruction for the lesser-included offense of assault in addition to the instruction for aggravated assault with a deadly weapon.

3

An offense is a lesser-included offense of a charged offense if "it is established by proof of the same or less than all the facts required to establish the commission of the offense charged" or if "it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission." *See* Tex. Code Crim. Proc. Ann. art. 37.09(1), (2) (West 2006). In order for an appellate court to determine that a trial court should have submitted a requested lesser-included-offense instruction, two requirements must be met. *Young v. State*, 283 S.W.3d 854, 875 (Tex. Crim. App. 2009). The first requirement provides that "the lesser-included offense must be included within the proof necessary to establish the offense charged." *Id.*; *see Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011). The first consideration is a question of law and "does not depend on the evidence to be produced at trial." *Rice*, 333 S.W.3d at 144.

The second requirement provides that "there must be some evidence in the record that if the defendant is guilty, he is guilty only of the lesser-included offense." *Young*, 283 S.W.3d at 875; *see Rice*, 333 S.W.3d at 145. In other words, "a lesser included offense may be raised if evidence either affirmatively refutes or negates an element establishing the greater offense, or the evidence on the issue is subject to two different interpretations, and one of the interpretations negates or rebuts an element of the greater." *Schweinle v. State*, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996). To satisfy the second requirement, "[t]he evidence must establish the lesser-included offense as 'a valid, rational alternative to the charged offense.'" *Rice*, 333 S.W.3d at 145 (quoting *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007)). In performing this review, appellate courts "must consider all of the evidence introduced at trial, whether produced by the State or the defendant," but

4

appellate courts may not consider the "credibility of the evidence and whether it conflicts with other evidence or is controverted." *Young*, 283 S.W.3d at 875-76. In addition, "it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; there must be some evidence directly germane to a lesser included offense for the factfinder to consider before an instruction on a lesser included offense is warranted." *Bignall v. State*, 887 S.W.2d 21, 24 (Tex. Crim. App. 1994). "[A]nything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge." *Hall*, 225 S.W.3d at 536 (Tex. Crim. App. 2007).

On appeal, the State concedes that the first requirement is met in this case. *See Irving v. State*, 176 S.W.3d 842, 845-46 (Tex. Crim. App. 2005) (providing that simple assault is lesser-included offense of aggravated assault when conduct constituting simple assault is same conduct alleged in aggravated assault charge); *see also Grey v. State*, 269 S.W.3d 785, 788 (Tex. App.—Austin 2009) (stating that "bodily injury assault in the manner alleged, but without the deadly weapon, is a lesser included offense of the alleged aggravated bodily injury assault"), *rev'd on other grounds*, 298 S.W.3d 644 (Tex. Crim. App. 2009). Regarding the aggravated assault charge, the indictment alleged that Jordan "intentionally, knowingly, or recklessly cause[d] bodily injury to [Brown] . . . by strangling . . . [Brown]" with his hand, that he used or exhibited "a deadly weapon, to-wit: the defendant's hand" during the assault, and that "the manner of its use or intended use was capable of causing death or serious bodily injury." *See* Tex. Penal Code Ann. § 22.02 (West 2011) (explaining that person commits aggravated assault if he commits assault and causes serious bodily injury to another or uses or exhibits deadly weapon); *id.* § 1.07(a)(17) (West Supp. 2011) (defining "deadly weapon" as "anything that in the manner of its use or intended use is capable

of causing death or serious bodily injury"). Jordan sought an instruction for assault, which is statutorily defined as occurring if someone "intentionally, knowingly, or recklessly causes bodily injury to another." *See id.* § 22.01 (West 2011).

When challenging the district court's decision to not include the lesser included offense, Jordan points out that in his testimony he admitted that he assaulted Brown and slapped her "numerous times." During trial, Jordan testified that when he hit Brown, he only used an open hand, and he specifically denied strangling and choking Brown. When asked during trial to describe how Brown sustained injuries to her neck, Jordan asserted that the injuries to her neck could have happened when he slapped her. Specifically, he related, "I was slapping -- when we were fighting, I would hit a couple of times. It was here, here (indicating). We were arguing." In addition to referring to the portions of his testimony in which he described slapping Brown, he points to portions of his testimony in which he stated that he never wanted to kill Brown, to cause her temporary or permanent disfigurement, or to cause any loss of use of her limbs or bodily functions. In addition, Jordan refers to the portions of his testimony in which he denied that he used his hand in a manner that would constitute a deadly weapon and to portions in which he indicated that he had a pre-existing injury to his right hand that prevents him from forming a fist. In light of this testimony, Jordan insists that "the issue of assault" was raised "in the context of the charged offense."

In resolving whether the second prong is met, we must bear in mind the manner in which the assault was alleged to have occurred. *See Parrish v. State*, 869 S.W.2d 352, 354 (Tex. Crim. App. 1994) (explaining that critical elements of indictment other than statutory elements "such as time, place, identity, manner and means, although not statutory, are germane to whether one

6

offense includes another"); *see also Sweed v. State*, 351 S.W.3d 63, 67 (Tex. Crim. App. 2011) (explaining that when determining whether something is lesser-included offense, courts consider statutory elements and "any descriptive averments in the indictment for the greater offense"). The indictment alleged that Jordan committed aggravated assault by "by strangling" Brown. "Strangle" is generally defined as "to compress the windpipe of until death results from stoppage of respiration: to choke . . . by compressing the throat with or as if with a hand or rope: throttle." *Webster's Third New Int'l Dictionary* 2256 (2002).

As discussed above, Jordan argues that a lesser-included-offense instruction should have been given because he admitted in his testimony that he assaulted Brown by slapping her and because he denied using his hand as a deadly weapon. When he asked for the lesser-included instruction, Jordan repeated his assertion that he did not choke Brown but asserted that his testimony regarding the manner in which he injured Brown entitled him to a lesser-included instruction for assault. However, the brief yet repeated slapping contact that Jordan admitted to is fundamentally different from the sustained squeezing conduct alleged in this case.[2] Accordingly, "the conduct

---

[2] During the trial, Brown described the incident and her injuries and testified that Jordan got on top of her, put "his hands around" her neck, and cut off her air supply and that she was "gasping for air" and could not breathe. In fact, when describing the force with which Jordan strangled her, she said that she "lost control of [her] bladder" and that it caused her eyes to appear bloodshot. Brown also stated that she had difficulty breathing for weeks after the attack. The State also called Dr. David Dolinak as an expert witness to discuss the effects of strangulation. In his testimony, Dr. Dolinak explained that if someone is being strangled, he can die within a few minutes if "pressure is put on real well." When asked to review photos of injuries to Brown's neck and the bleeding in her eyes, Dr. Dolinak concluded that the injuries were consistent with someone who had been strangled. Dr. Dolinak also agreed that if someone uses his hands to strangle another person, then his hands qualified as deadly weapons. *See* Tex. Penal Code Ann. § 1.07(a)(17) (West Supp. 2011) (defining deadly weapon as "anything that in the manner of its use or intended use is capable of

7

constituting the lesser-included offense for which [Jordan] requested an instruction is different than the conduct which was alleged in the charging instrument for [Jordan's] aggravated-assault charge," and Jordan asked "for a lesser-included offense instruction based on facts not required to establish the commission of the offense charged." *See Irving*, 176 S.W.3d at 845. Assault by slapping someone is not a lesser-included offense of aggravated assault by strangling someone "because the same facts or less than the same facts required to prove the aggravated assault offense are not required to prove the assault offense." *See id.* at 846. "A trial court is not required to instruct a jury on a lesser included offense where the conduct establishing the lesser offense is not 'included' within the conduct charged." *Id.*

For the reasons discussed above, Jordan was not entitled to a lesser-included-offense instruction for assault. Accordingly, we conclude that the district court did not err by refusing to provide a lesser-included-offense instruction and overrule Jordan's first issue on appeal.

*Recordings*

In his second issue on appeal, Jordan contends that the district court erred by refusing to admit into evidence copies of recordings of conversations between Jordan and Brown that were made weeks before the assault at issue in this case. The recordings were made when Jordan called Brown from prison. During these conversations, Brown and Jordan discussed a recent sexual encounter that they had and about sexual activities they might perform in the future, including

---

causing death or serious bodily injury"). Similarly, Detective Charles Riley testified that in his training and experience, a person's hand may be used as a deadly weapon and that based on his investigation of the case, he believed that Jordan used his hand as a deadly weapon.

8

shopping for and the use of sexual toys.  In one of the conversations, Jordan mentions wanting to insert a wine bottle into Brown's vagina.  When Jordan sought to admit the recordings, the district court concluded that they either were not admissible under rule 412 of the rules of evidence or were not relevant.  Rule 412 states that in prosecutions for "sexual assault or aggravated sexual assault," "reputation or opinion evidence of the past sexual behavior of an alleged victim" is not admissible and that "evidence of specific instances of an alleged victim's past sexual behavior is also not admissible" unless certain requirements are met.  Tex. R. Evid. 412(a), (b).

On appeal, Jordan argues that the district court erred by refusing to admit the recorded conversations into evidence.  First, Jordan argues that those conversations are not prohibited under rule 412 because the conversations, or at least part of the conversations, do not refer to specific instances of Brown's past sexual behavior and are not reputation or opinion evidence relating to Brown's past sexual behavior.

Next, Jordan argues that if the conversations were governed by rule 412, those conversations were still admissible under one of the exceptions identified in rule 412.  Specifically, Jordan contends that the conversations were admissible because they are evidence "of past sexual behavior with the accused and [were] offered by the accused upon the issue of whether the alleged victim consented to the sexual behavior which is the basis of the offense charged." *See id.* R. 412(b)(2)(B).  Further, Jordan contends that the conversations relate to whether Brown consented to the acts at issue because in those conversations Jordan and Brown discussed performing acts that were similar to the acts described in the indictment, including hair pulling and the insertion of a wine bottle into Brown's vagina.

9

Finally, for those same reasons, Jordan also argues that the conversations were relevant to his defense. *See id.* R. 401 (defining "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would without the evidence"), 402 (stating that relevant evidence is generally admissible). In particular, Jordan contends that the evidence was relevant to his defense that Brown willingly accompanied him to the hotel and consented to the sexual acts that formed the basis for the charges against him.

Even assuming for the sake of argument that the district court erred by failing to admit the recorded conversations, we would be unable to sustain Jordan's second issue on appeal. When deciding whether there is reversible error in a criminal case, courts must determine whether the error is constitutional error or non-constitutional error. *See* Tex. R. App. P. 44.2. For constitutional errors that are subject to a harmless error analysis, "the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." *Id.* R. 44.2(a). For non-constitutional errors, the reviewing court must disregard the error unless it affects substantial rights. *Id.* R. 44.2(b).

Generally speaking, there is no constitutional right guaranteeing defendants the opportunity to present all the evidence that is favorable to them. *Potier v. State*, 68 S.W.3d 657, 659 (Tex. Crim. App. 2002). In fact, the erroneous exclusion of a defendant's evidence is "constitutional error only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense." *Id.* at 665. The fact that a defendant was not allowed to present his case in the form and to the extent that he desired is not prejudicial if he was not prevented from presenting the substances of his defense. *Id.* at 666.

10

In this case, Jordan was able to present his defense to the jury. In his opening statement, Jordan asserted that Brown voluntarily met him and agreed to accompany him to the first hotel, that she had opportunities to leave or ask for help but chose not to, and that Brown consented to all of the sexual interactions. When Jordan testified near the end of the trial, he also stated that Brown willingly met him at the hotel in Austin and denied dragging her to the hotel room. Further, he explained that after they went into the hotel room, he kissed her and that she kissed him back. Although Jordan admitted that he "kind of went off" and slapped Brown "with both hands, open hands, numerous times," he explained that he apologized to Brown, that they began kissing again, and that they had consensual sex two times. In addition, Jordan admitted that he bit Brown's nose but insisted that any physical injuries that she sustained occurred when he slapped her. Moreover, Jordan stated that while they were at the hotel, Brown willingly inserted a wine bottle into her vagina, and he denied ever inserting a wine bottle. Although the State objected to the question, Jordan testified that he and Brown had previously discussed using a wine bottle as a sex toy. In his testimony, Jordan also stated that when he left the hotel room to get some food, Brown willingly stayed in the hotel room. When questioned about why some of Brown's hair had been discovered in the Austin hotel room, he related that it fell out when he and she were combing her hair with a brush and that he never pulled her hair out. In his testimony, Jordan insisted that he never threatened Brown and did not keep her in the hotel room against her will.

In addition to his testimony, Jordan was allowed to cross examine Brown regarding his defense. In particular, he asked her about their prior romantic relationship and prior consensual encounters that they had, including whether they had ever used a wine bottle in a sexual manner,

11

questioned her regarding whether she willingly met Jordan at the hotel in Austin, and asked if she stayed in the hotel room on the morning after the assault when Jordan left the room for ten to fifteen minutes to grab some food.

During the trial, Jordan called George Valenzuela to testify regarding events that occurred after Jordan and Brown left Austin. Valenzuela was the maintenance man for the hotel in San Antonio that Jordan checked into after leaving Austin. In his testimony, Valenzuela briefly explained that he saw Jordan and Brown walk to a hotel room and that it appeared that Brown voluntarily entered the hotel room, and he agreed that no one forced her into the room.

Finally, in his closing argument, Jordan argued that Brown consented to the sexual acts that formed the basis for the aggravated sexual assault claims against him. Regarding the wine bottle, he told the jury that they could not "believe that he took a bottle and without some cooperation shoved it up in her vagina. Think of the immense damage that would do if she's struggling and he's trying to do that. That, ladies and gentlemen, didn't happen." In his closing, Jordan also focused on the fact that Brown did not immediately tell law enforcement officials that she was sexually assaulted, that Brown provided no testimony demonstrating that she attempted to call 911 while she was in the hotel in Austin, and that Brown did not leave the hotel room when Jordan briefly left.

In light of the presentation of this evidence, we must conclude that the district court's refusal to admit the recordings did not preclude Jordan from presenting the substance of his defense and, accordingly, that any error stemming from the exclusion of the recorded conversations would not rise to the level of constitutional error.

12

Having determined that any error stemming from the exclusion of the recorded conversations would not be constitutional in nature, we must now decide whether the alleged error affected Jordan's substantial rights. *See* Tex. R. App. P. 44.2(b). A defendant's substantial rights are affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In performing this analysis, the reviewing "court should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *see Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). If the reviewing court, "after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect," then the defendant's substantial rights were not affected. *Motilla*, 78 S.W.3d at 355.

In light of the record in this case, we must conclude that any error resulting from the exclusion of the evidence would not have affected Jordan's substantial rights. As summarized above, Jordan argued and testified during trial that Brown consented to the sexual acts alleged in the indictment. However, the testimony of Brown, Galvan, and various law enforcement officials regarding the assault and the events leading up to and occurring after the assault demonstrated that Brown did not consent.

In her testimony, Brown acknowledged that in the past she had a consensual sexual relationship with Jordan but explained that while Jordan was in prison for violating his parole, she began dating Galvan and told Jordan that she was not feeling "right about" her relationship with

13

Jordan. She also stated that after he was released from prison, he called her multiple times and that it made her nervous. In addition, she admitted that just prior to Jordan being released, she was trying to decide whether to be in a relationship with Jordan and also related that the tone of the text messages that Jordan was sending changed from cordial to hostile. One of the text messages that Jordan sent after he was released from prison read, "Im comin bitch." In her testimony, Brown related that Jordan asked to see her but that she was afraid to meet with him. In fact, Brown testified that she contacted the police before meeting with Jordan to express her concerns. Although Brown stated that she was afraid to meet with Jordan, she testified that she agreed to meet him even though she felt uneasy about it because she felt like she owed it to Jordan to see him. Brown testified that after agreeing to meet with Jordan, she pulled into the parking lot of a hotel in Austin and that Jordan approached her car, took her keys, grabbed her by the arm, and "forcefully walked" her to a hotel room.

In her testimony, Brown also described what happened after she entered the hotel room. First, she stated that Jordan grabbed her purse, dumped the contents out, and broke her work cell phone. Next, she testified that Jordan hit her on the side of her face and ordered her to remove her clothing. Then, Brown stated that after she removed her clothing, Jordan read the text messages on her personal cell phone, became even more angry, and continued to hit her in the face with his hands and with beer bottles. In fact, she said that he hit her so many times that she was not even able to guess how many times it was and that he continued to assault her for approximately nine hours. In her testimony, Brown also explained that Jordan bit her nose so hard that the tip nearly came off, that he bit her lip and tried to rip it off, and that he bit her breasts. In addition, Brown stated that

14

Jordan took a closet rod and hit her midsection with it. Brown also related that Jordan tied a telephone cord to her feet and dragged her around the room and told her that she would not survive the night.

Furthermore, Brown testified that Jordan did not sexually assault her until over six hours after he started physically assaulting her. Regarding the sexual assault, Brown explained that she tried to resist but that Jordan inserted a wine bottle into her vagina. Then, Brown stated that Jordan sexually assaulted her by placing his penis in her vagina and that she tried to struggle free but was exhausted at that point and was no longer able to speak. In her testimony, Brown explained that Jordan bit her vagina repeatedly. On numerous occasions, Brown insisted that she did not consent to any sexual act that night, and she also denied ever previously using a wine bottle in a sexual manner. Although Brown related that Jordan briefly left her alone in the hotel on the morning after the assault, she explained that she did not attempt to leave the hotel because she was too exhausted to leave and was afraid of what Jordan would do to her if she left. Moreover, she explained that he only left her alone long enough to grab something to eat for breakfast and that when he returned he told her to shower and informed her that they were driving down to San Antonio.

When Galvan was called to the stand, he testified regarding the events leading up to Jordan's arrest. Specifically, he related that he was dating Brown weeks before Jordan was released from prison and that while they were dating, Jordan would call both of them and make threatening comments. Further, Galvan stated that on the day of the assault, he talked with Brown and made plans to meet up around 5:30 but that she did not meet him. In addition, he related that when she did not meet him, he repeatedly called her cell phone but that she never answered his calls. Next, Galvan testified that after calling Brown's phone approximately fifteen times, Jordan answered and

15

said, "I'm knocking the honey out of this pussy." In addition, Galvan stated that he heard Brown screaming in the background and described her screaming as sounding like she had lost control and was in pain. Moreover, Galvan related that he continued to call Brown's phone and that each time that Jordan answered, he could hear Brown screaming in the background. Galvan also told the jury that Jordan called him twice and related what "he was doing" to Brown and that he could hear Brown crying uncontrollably. Further, Galvan related that it was clear to him that Brown was "not there on her own will." In addition to describing the phone calls, Galvan related that when he saw Brown in San Antonio, he "almost didn't recognize her" because she was "beat up really bad."

As mentioned above, the State called various law enforcement personnel to the stand. In particular, Officer Christopher Limmer testified that he responded to a call stating that Jordan may have kidnapped Brown and that when he arrived at the hotel in Austin after Jordan and Brown had left, the condition of the room "looked like there was a huge struggle." Another officer, Detective Mike Summers, testified that when he examined the room, he noticed "a large amount of clumps of hair lying on the floor with a fair amount of blood on the bed and blood on the floor of the bathroom." Next, Detective Sandra Benningfield testified that she observed broken fingernails on the floor, blood in the bathroom and on a pillowcase, and wine bottles. She also stated that she saw a telephone cord that had been cut into three pieces. In addition, Detective Charles Riley related that when he saw Brown after Jordan had been arrested, her appearance indicated that she had been hit in the face more than once. Similarly, Officer Jason Bratton testified that when he saw Brown at the hotel in San Antonio, she "had severe bruising and swelling to the face." He also explained that when he transported Jordan to jail, he noticed that Jordan had scratches on his arms.

16

During the trial, the State called to the stand the sexual assault nurse examiner who examined Brown when she was taken to a hospital in San Antonio. In her testimony, Shelly Botello explained that she remembered performing the exam very well because of "the amount of brutality and trauma to" Brown. In fact, she said that of the thousands of exams that she has reviewed, the amount of trauma that Brown sustained was "in the top 1 percent." In her exam, Botello found areas of "redness and rawness" on Brown's vagina that corresponded to where Brown said Jordan bit her. She also described tearing that Brown sustained.

In addition to the testimony summarized above, the State also introduced into evidence various photographs demonstrating significant injuries to Brown's eyes, lips, nose, ears, neck, hands, breasts, and vagina as well as photos depicting large clumps of hair found in the hotel room in Austin.

In light of the overwhelming evidence summarized above showing that Brown did not consent to the sexual acts alleged in the indictment, we must conclude that any error stemming from the district court's decision to not admit into evidence the requested recordings did not have "a substantial and injurious effect or influence in determining the jury's verdict" and therefore did not affect Jordan's substantial rights. *See King*, 953 S.W.2d at 271. Accordingly, we hold that any error would be harmless and overrule Jordan's second issue on appeal. *See* Tex. R. App. P. 44.2(b).

## CONCLUSION

Having overruled both of Jordan's issues on appeal, we affirm the judgment of the district court.

17

_____

David Puryear, Justice

Before Justices Puryear, Henson and Goodwin

Affirmed

Filed:   July 11, 2012

Do Not Publish